IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| THOMAS J. O'CONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:13-CV-035 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Thomas J. O'Connell ("O'Connell") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. O'Connell raises multiple arguments in his brief, challenging various aspects of the decision of the Administrative Law Judge ("ALJ"), each of which I discuss below. I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I **RECOMMEND DENYING** O'Connell's Motion for Summary Judgment (Dkt. No. 11), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 13.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that O'Connell failed to demonstrate that he was disabled under the Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted

1

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

O'Connell filed for DIB on December 6, 2010, claiming that his disability began on December 15, 2009. R. 14. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 109–22, 124–37, 14. On August 22, 2012, ALJ Brian P. Kilbane held a hearing to consider O'Connell's disability claim. R. 76–107. O'Connell was represented by an attorney at the hearing, which included testimony from O'Connell and vocational expert Ashley Wells. R. 76–107.

On August 30, 2012, the ALJ entered his decision analyzing O'Connell's claim under the familiar five-step process[2] and denying O'Connell's claim for benefits. R. 14–26. The ALJ found that O'Connell suffered from the severe impairments of hearing loss, gouty arthritis of the feet, possible mild degenerative joint disease in the hands and feet, anxiety disorder, adjustment

---

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2),.

[2] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2

disorder, and history of substance use. R. 16. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 16–18. The ALJ further found that O'Connell retained the RFC to perform medium work with multiple exertional and non-exertional limitations.[3] R. 18. The ALJ determined that O'Connell could not return to his past relevant work as an attorney (R. 24–25), but that O'Connell could work at jobs that exist in significant numbers in the national economy, such as hand packager, hospital cleaner, and kitchen helper. R. 25. Thus, the ALJ concluded that O'Connell was not disabled. R. 26. On May 29, 2013, the Appeals Council denied O'Connell's request for review (R. 1–5), and this appeal followed.

## ANALYSIS

O'Connell asserts that the ALJ's decision should be reversed for five reasons. First, he contends that the ALJ failed to account for medical evidence showing that he suffers debilitating effects from his sudden sensorineural hearing loss, and that his hearing impairment precludes him from working in any of the positions identified by the ALJ. Second, he claims that the ALJ erred in relying upon the opinions of the consultative examiner, William Humphries, M.D., because Dr. Humphries' opinions are not supported by either his examination of O'Connell or the other medical evidence of record. Third, he argues that the ALJ improperly evaluated the impact of his depression and anxiety when determining his RFC and, in particular, failed to give greater weight to the opinions of his treating physician, David Hartman, M.D. Fourth, O'Connell claims that the ALJ's credibility findings are not supported by substantial evidence. Finally, O'Connell contends that the ALJ erred in finding that he could perform medium-level work and

---

[3] An RFC is an assessment, based upon all of the relevant evidence, of what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545. Descriptions and observations of a claimant's limitations by him and by others must be considered along with medical records to assist the Commissioner in deciding to what extent an impairment keeps a claimant from performing particular work activities. Id.

3

that, because he can only perform light work, he is disabled under Medical Vocational Guideline 202.06. I find that substantial evidence supports the ALJ's decision on each ground challenged by O'Connell, and recommend affirming the final decision of the Commissioner.

## **Limitations Imposed by Hearing Loss**

O'Connell, who was 63 years old at the time of the ALJ's decision, holds both a master's degree in business administration and a law degree. R. 77, 109. He previously worked as a patent attorney and was a partner at an intellectual property law firm. R. 78. O'Connell testified that he has always had problems with anxiety, but that he also became depressed in 2007, when he and his wife separated. R. 79. O'Connell claimed that that his work as an attorney was stressful, but that he became "highly anxious" and "highly depressed" when that stress was compounded with his marital difficulties and eventual separation. R. 79. O'Connell voluntarily left his job because of his anxiety and depression and withdrew from his firm effective September 2007. R. 80.

In December 2009, O'Connell experienced spontaneous hearing loss. R. 80. He was seen by Geoffrey Harter, M.D. on December 18, 2009, and reported having a sudden onset of hearing loss in his right ear, as well as vertigo two weeks prior, although the vertigo had "largely resolved." R. 289. Dr. Harter's records reflect that O'Connell complained that his right ear felt full and that he had the sensation of fluid in his ear. R. 289. An audiogram showed mild high frequency sensorineural hearing loss in the left ear, and in the right ear he had severe to profound sensorineural hearing loss with discrimination of only 48% versus 96% in the left ear. R. 290. Dr. Harter diagnosed a sudden sensorineural hearing loss associated with vertigo and prescribed Sterapred DS. R.290. A subsequent MRI on December 21, 2009 showed no internal auditory canal abnormality but noted some generalized atrophy and some focal ischemic changes, which appeared chronic. R. 294. Dr. Harter also discussed with O'Connell the possibility of a hearing aid trial in his right ear. R. 290.

4

O'Connell followed up with Dr. Harter on January 12, 2010, with no improvement in his hearing loss or vertigo. R. 288. O'Connell complained that he still was having tinnitus and difficulty understanding people, especially in situations with background noise. R. 288. An audiogram showed "really no functional hearing in the right ear." R. 288. Dr. Harter provided O'Connell a handout on tinnitus management, recommended he try melatonin to help him sleep, and renewed his Lorazepram to assist with anxiety. R. 288. Dr. Harter also referred O'Connell to John Mason, M.D. at the University of Virginia for evaluation and discussion of options for hearing rehabilitation. R. 288.

O'Connell met with Dr. Mason on February 17, 2010. R. 264. Again, an audiogram indicated "left high frequency mild down sloping sensorineural hearing loss" and "right profound sensorineural hearing loss." R. 265. Dr. Mason diagnosed O'Connell with right labyrinthitis, an inflammation of the inner ear structure that can cause vestibular dysfunction, and recommended a follow-up audiogram in six months. R. 265.

O'Connell returned to Dr. Harter on December 9, 2010, stating that he had noticed increasing difficulty in the past months with his hearing in the left ear. R. 286. An audiogram showed no functional hearing in the right ear and "slightly worsened high frequency sensorineural hearing loss" as compared to his December 2009 audiogram. R. 286. Dr. Harter again discussed amplification (hearing aid) with O'Connell. R. 287. Dr. Harter also renewed his Lorazepam prescription for anxiety, which Dr. Harter noted is "typically associated with loud noise situations." R. 287.

Despite Dr. Harter's recommendation that O'Connell purchase a hearing aid for his left ear, O'Connell testified at the hearing before the ALJ that he was unable to purchase a hearing aid because it was too expensive and not covered by insurance. R. 81. O'Connell reported to his counselor in January 2010, however, that he and his wife are living off of his retirement savings,

5

R. 274, and testified to the ALJ that he employs people to assist with housework and yard work. R. 92.

In determining O'Connell's RFC, the ALJ noted his hearing impairment, and found that O'Connell should avoid concentrated exposure to noise. R. 18. The ALJ did not establish a more restrictive RFC regarding O'Connell's hearing, because the treatment records did not support O'Connell's allegations regarding the severity of the symptoms. The ALJ noted that O'Connell "had not used or been prescribed a hearing aid." R. 23. The ALJ also noted that O'Connell told a provider in February 2010 that his balance was back to baseline and that his tinnitus did not interfere with his activities of daily living or sleep. R. 23 (citing Ex. 1F, R. 264). Additionally, the ALJ pointed out that although O'Connell continued to report problems with tinnitus to care providers, he went to see a hearing specialist only once more after his initial appointments—in December 2010. R. 23. Finally, the ALJ noted that the O'Connell told a provider that he did not believe he qualified for disability since he only had severe hearing loss in one ear. R. 23. Based on all of these facts, the ALJ concluded that the severity of O'Connell's limitations was not as severe as he claimed and that his limitations were adequately accounted for in the RFC. R. 23.

O'Connell argues that the ALJ erred in relying on these factors and insists that he cannot work in the positions cited in the ALJ's decision. He contends—without citation to the record— that he "is unable to hear instructions from supervisors or interact at all with co-workers due to his hearing loss and continuous ringing in his ears" and that the cited "jobs all involve background noise, which further complicates [his] ability to hear." Dkt. No. 12, p. 23. Two of the jobs identified by the vocational expert require no hearing ability at all. See Dkt. No. 14 , p. 12 (citing R. 25, 100–01; Dictionary of Occupational Titles ("DOT") 920.587-010, 1991 WL 687914 (hand packager position stating "Hearing: Not Present – Activity or condition does not exist); DOT 323.687-010, 1991 WL 672782 (same as to hospital cleaner position)). The third job

6

identified by the vocational expert requires only "occasional" hearing, and "not significant" interaction with other people. See DOT 318.687-010, 1991 WL 672755 (kitchen helper position). Additionally, O'Connell does not point to an opinion from any medical provider that he "cannot hear instructions from supervisors or interact at all with co-workers," as he claims in his brief. Dkt. No. 12 , p. 23.

O'Connell also takes issue with the ALJ's reliance on his failure to obtain a hearing aid, noting that he should not be penalized for his lack of financial resources and further, that the aid will not provide any improvement to O'Connell's right ear, where he has experienced a total loss of hearing. Dkt. No. 12 , p. 23. But the failure to obtain a hearing aid, as well as the failure to seek continued treatment for his hearing loss, both support the ALJ's determination that O'Connell's hearing loss is not as limiting as he claims.

Finally, O'Connell accuses the ALJ of erroneously relying on the assessment of Dr. Humphries that he could respond appropriately to the spoken voice and normal volume at 2 to 4 feet. R. 312; Dkt. No. 12 at 24–25. O'Connell insists that his own testimony makes clear that background noise (which he says must exist in the positions the ALJ found available) greatly affects his ability to hear and respond to the human voice. Dr. Humphries' opinion is consistent not only with his own examination of O'Connell, R. 312, but also with the audiogram results showing that O'Connell's word recognition in his left ear was excellent. R. 266. Notably, O'Connell does not point to any care provider who found that he was more limited than the ALJ's RFC determination, either as to his hearing loss or as to any other impairment. Therefore, I conclude that substantial evidence supports the ALJ's conclusions as to the functional limitations resulting from O'Connell's hearing loss.

### Opinions of the Consultative Examiner

O'Connell next contends that the ALJ should have given little or no weight to the opinion

7

of Dr. Humphries, who performed a consultative examination of O'Connell on May 11, 2011. Dr. Humphries noted O'Connell's complaints of hearing loss in his right ear, anxiety, plantar fascitis (later determined to be arthritic-type gout) in both feet, and low back pain. R. 310. Dr. Humphries found that O'Connell was limited to sitting six hours in an eight-hour workday, standing and walking six hours in an eight-hour workday, and to lifting 50 pounds occasionally and 25 pounds frequently. Dr. Humphries further limited O'Connell to occasional climbing, kneeling, or crawling, and prohibited him from using repetitive foot controls. R. 313.

The ALJ "generally adopt[ed]" the consultative examiners' assessments because they are consistent with the other credible evidence of record. R. 24. The ALJ also adopted Dr. Humphries' postural limitations and lifting restrictions. R. 18.

O'Connell claims that Dr. Humphries failed to take into account his gouty arthritis, degenerative joint disease in his hands and feet, and his knee pain. Dkt. No. 12, p. 25. O'Connell contends, without identifying any supporting medical opinion, that these impairments prevent him from lifting 50 pounds occasionally and 25 pounds frequently. O'Connell relies upon his testimony and his reports to his medical providers of pain and inability to lift much weight to support his position. No medical provider, however, has rendered an opinion regarding O'Connell's functional abilities which found him more limited than the RFC suggested by Dr. Humphries. Additionally, both state agency physicians independently reviewed the record and concluded that O'Connell had the physical RFC to occasionally lift 50 pounds, frequently lift 25 pounds, and to stand/walk, and sit, each for 6 hours in a workday. R. 117, 131–32.

Dr. Humphries' opinion is consistent with his physical examination, R. 311–313, and is not inconsistent with other medical evidence. Thus, the ALJ's decision to generally adopt Dr. Humphries' opinion is supported by substantial evidence.

**Mental Limitations and Treating Physician's Opinion**

8

O'Connell asserts that the ALJ's determination of his RFC failed to adequately account for his mental limitations and that his mental impairments, when considered in combination with his hearing loss and other physical impairments, render him disabled. The ALJ determined that O'Connell had severe impairments of anxiety disorder, adjustment disorder, and a history of substance use. R. 16. The ALJ limited O'Connell to work involving a small number of coworkers, but not with the general public, and found that he was able to perform complex tasks, maintain regular attendance and complete a normal workday or workweek without interruptions resulting from his psychiatric condition. R. 18. The ALJ further held that O'Connell was unlikely to decompensate due to the usual stresses of competitive 40-hours per week of employment. R. 18.

In 2007 and 2008, O'Connell was seen by Brian Doyle, M.D., in Washington, D.C. for depression and anxiety. R. 325–348. In August 2007, O'Connell reported that his depression had increased over the last year and a half, that his work was stressful and unhappy, that he had few friends, and that his wife was dissatisfied with their marital life. R. 328. He told Dr. Doyle that he and his wife separated in June, which had caused him to feel worse and that he was concerned about deteriorating further if they divorced. R. 329. O'Connell also acknowledged abusing alcohol and attending AA meetings and another outpatient group treatment program that he found helpful. R. 328.

On August 7, 2007, Dr. Doyle diagnosed O'Connell with major depressive disorder, social anxiety disorder, alcohol abuse, hypertension, GERD, plantar fasciitis, hyperhidrosis, idiopathic benign tremor, and moderate stress. R. 329. He assigned O'Connell a GAF[4] score of

---

[4] The GAF Scale is used by mental health professionals to rate overall functioning and considers the psychological, social, and occupational functioning of an individual on a hypothetical continuum of 1 to 100. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Rev. 2000) (DSM IV), with 100 being the most high-functioning. The DSM IV defines GAF scores as follows: a score of 41–50

9

60. R. 329. He prescribed Lexapro and noted that O'Connell may need medication to help with sleep and to bolster his sobriety. R. 329. Dr. Doyle further recommended that he undergo individual psychotherapy and renew his affiliation with AA, for both social contact and sobriety purposes. R. 329. O'Connell continued to meet with Dr. Doyle in 2008, but most of the notes from those appointments are illegible. R. 330–48.

In May 2009, O'Connell was seen by Cornelis Craye, M.D., who had previously diagnosed him with a history of hypertension and alcohol withdrawal. R. 384. Dr. Craye noted that O'Connell was tapering off of Librium and was prescribed Benicar, Toprol, Prevacid, Catapres, and Ativan. R. 384. Dr. Craye prescribed Ambien for sleep. R. 384–85.

Between November 2, 2009 and December 22, 2009, O'Connell met with Steve Lewis, M.D. with Smith Mountain Lake Family Practice five times and reported anxiety, as well as dizziness. R. 301. Most of the notes from those examinations are either illegible or relate to his hearing loss or physical problems. R. 301.

After his hearing loss occurred in December 2009, O'Connell obtained a prescription from Dr. Harter for Lorazepam for anxiety, R. 287. O'Connell sought no other treatment for either anxiety or depression from 2007 until January 2011 when he reported to Comprehensive Counseling Services complaining of depression and anxiety associated with his hearing loss. R. 267. O'Connell had four visits over the next two months and was treated for anxiety and depression, generally with therapy and medication. There are no records of inpatient treatment for his mental impairments, aside from treatment for alcohol abuse and withdrawal.

---

suggests serious symptoms or serious impairment in social or occupational functioning; a score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning; a score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. DSM IV. The GAF has been dropped from the Fifth Edition of the DSM, published in 2013, due in part to its "conceptual lack of clarity" and "questionable psychometrics in routine practice." DSM-5 at 16. Despite its shortcomings, the GAF was used by O'Connell's providers during the relevant period of alleged disability and the ALJ discussed the scores. Thus, they are part of the medical evidence.

On April 13, 2012, O'Connell was evaluated by consultative examiner Marvin Gardner, Ph.D., who obtained O'Connell's mental health history and also evaluated him for cognitive functioning. R. 303–09. Dr. Gardner concluded that O'Connell could perform complex tasks and maintain regular attendance in the workplace, and that his concentration was within normal limits, but indicated that he did not believe O'Connell could perform his prior work without an unusually high number of rest periods. R. 308. Dr. Gardner determined that O'Connell could perform work activities without special or additional supervision, was capable of working with a small number of coworkers but not with the general public due to social anxiety disorder, and that he was unlikely to decompensate due to the usual stresses of competitive 40 hours per week of employment. R. 308. Dr. Gardner diagnosed O'Connell with episodic alcohol abuse, "in full sustained remission," anxiety disorder, NOS with panic attacks, panic disorder with agoraphobia, under good medical control, severe social anxiety disorder, and adjustment disorder with depressed mood. R. 309. He assessed O'Connell's current GAF as a 63 and his GAF within the past year as a 63. R. 309.

On May 14, 2012, Jessica Jeffrey, M.D., under the supervision of Dr. Hartman, performed a behavioral psychiatric evaluation of O'Connell. R. 607–609. Dr. Jeffrey diagnosed O'Connell with major depressive disorder moderate, panic disorder without agoraphobia, adjustment disorder with anxious features, and a history of alcohol dependence. R. 608. Dr. Jeffrey assigned a GAF of 55 at that time, and prescribed Trazodone for insomnia and Sertraline. R. 608. On June 13, 2012, Dr. Hartman discussed with O'Connell his alcohol abuse and recurrent depression, R. 610–11 . At that time, Dr. Hartman assessed his GAF as a 50. R. 611. Dr. Hartman continued O'Connell on Zoloft at 150 mg daily, continued his Trazodone for insomnia, and encouraged him to see a therapist and to not drink. R. 611.

O'Connell has a history of alcohol abuse, and has been inconsistent in describing his

11

drinking and how often he drinks excessively. O'Connell told Dr. Humphries that he drinks rarely and "not to excess." R. 311. He reported to Dr. Gardner during a psychological evaluation in April 2011, that he episodically abused alcohol between the ages of 50 and 60, but he denied past treatment for substance abuse or being a member of AA or NA and stated that he currently "very rarely ever [drank] alcohol." R. 306. In August 2007, O'Connell reported to Dr. Doyle that he received treatment in approximately 2003 at an outpatient substance abuse program, that he attended AA meetings, and that he attended another outpatient group treatment program in 2007. R. 328. Moreover, there are a number of medical records that relate to episodes during or in the year preceding his period of alleged disability when he was either hospitalized or otherwise sought treatment for excessive alcohol abuse or withdrawal from alcohol and related symptoms. These include: (1) a January 12, 2009 episode when he was diagnosed with alcohol withdrawal at Roanoke Memorial Hospital, R. 410–411; (2) a May 2009 episode when he was diagnosed with hypertension likely caused by alcohol withdrawal and dependence, R. 397–99, 412–17, and upon his discharge, diagnosed with uncontrolled hypertension, alcohol dependence, and gastroesophageal reflux disease, R. 415; (3) a July 31 through August 5, 2010 hospital stay after experiencing a syncopal episode, where he again was diagnosed with alcohol intoxication, as well as syncope and collapse, R. 473, 477, 552; and (4) a July 29, 2012 episode where he was taken to the hospital and assessed with alcohol intoxication after he awoke confused while on vacation, and called 911 thinking his wife had killed her mother (who had been dead for 14 years), R. 638–39, R. 621.

    The Commissioner's regulations provide a framework for evaluating mental impairments, and the ALJ employed that framework in this case. Specifically,

> [i]n evaluating mental impairments, the ALJ employs a specific technique that considers four functional areas essential to the ability to work: activities of daily living; ability to maintain social

> functioning; concentration, persistence, and pace in performing
> activities; and deterioration or decompensation in work or work-
> like settings (Psychiatric Review Technique "PRT" findings). 20
> C.F.R. §§ 404.1520a, 416.920a (2011). The ALJ's decision must
> show the significant history and medical findings considered and
> must include a specific finding as to the degree of limitation in
> each of the four functional areas. 20 C.F.R. §§ 404.1520a(e)(4),
> 416.920a(e)(4) (2011).

Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. Dec. 21, 2011) (unpublished). In this case, the ALJ addressed each of the four functional areas and expressly found that O'Connell had only mild limitation in the first area, activities of daily living. The ALJ relied primarily on O'Connell's own reports that he had no problems with personal care, could prepare his own meals, was able to drive a car, go out alone every day, and could shop daily. He also spent time watching television and reading and spent time with others on email and the telephone. R. 17. The ALJ found O'Connell had moderate difficulties in the second and third areas and that he had no episodes of decompensation of extended duration. R. 17. Although O'Connell accuses the ALJ of "arbitrarily determining the severity" levels, Dkt. No. 12 , p. 29, he does not specifically challenge any of these conclusions, and based on the record, I conclude they are supported by substantial evidence.

O'Connell advances several claims in support of his contention that the ALJ did not adequately evaluate his mental impairments. First, he argues that Dr. Hartman is a treating source and his opinions should have been given greater weight than the one-time consultative examiner, Dr. Gardner. O'Connell especially emphasizes that Dr. Hartman assigned O'Connell GAF scores ranging from a high of 55 to a low of 50, both scores below the score of 63 given by Dr. Gardner in April 2011. O'Connell complains that the ALJ "misreports" his GAF scores when saying it was 63 both currently (i.e., as of the August 30, 2012 opinion) and within the past year.

Dr. Hartman did indeed assess O'Connell with a lower GAF than Dr. Gardner did—and

13

more recently than Dr. Gardner—but it does not appear that the ALJ relied exclusively, or even primarily, on the reported GAF scores. Instead, the ALJ discussed in detail all of the record evidence concerning O'Connell's mental impairments. R. 18–24. While the ALJ noted Dr. Gardner's assigned GAF score of 63, he also noted that O'Connell had been given a GAF score of 60 both in January 2011 and July 2011 by Roger Laplace, LPC, at Comprehensive Counseling Services, and he referred to the GAF scores of 50 and 55 from Dr. Hartman. R. 21–23. Significantly, Dr. Hartman's lower score, even if fully credited, would not direct a finding that O'Connell was disabled. A GAF score, standing alone, is not evidence of disability. Powell v. Astrue, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013) ("A GAF score is thus not dispositive of anything in and of itself and has no direct legal or medical correlation to the severity requirements of social security regulations.") (citation and internal quotation marks omitted); Allen v. Comm'r, 2010 WL 1142031, at *10 (E.D. Va. Feb. 24, 2010) (collecting authority discussing significance to be attached to GAF scores, and ultimately concluding that the claimant's "GAF score of 50 has minimal relevance in determining the severity of her mental impairment"); see also Porter v. Astrue, 2008 WL 4707541, at *4 (M.D. Pa. Oct. 23, 2008) (noting that "a GAF score is a subjective scale that only reflects an individual's functioning at a particular moment in time").

      O'Connell's challenge that the ALJ failed to credit Dr. Hartman's "opinion," also fails because Dr. Hartman did not offer an opinion as to how O'Connell's psychological functioning affected his ability to work. He assigned different GAFs at two appointments, but for the reasons already discussed, that does not constitute an "opinion" as to a claimant's functional capacity for Social Security purposes. Thus, the ALJ's obligation to give good reasons for any decision not to give controlling weight to a treating physician's opinion, see 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2), does not apply here.

14

The Fourth Circuit has explained that there is no "absolute" rule that greater weight should be afforded to a treating physician's opinion and indeed, it may be given less weight "if there is persuasive contrary evidence." Hines v. Barnhart, 453 F.3d 559, 563 & n.2 (4th Cir. 2006) (quoting Hunter v. Sullivan, 933 F.2d 31, 35 (4th Cir. 1992)). If, for example, the treating physician's opinion is not supported or is otherwise inconsistent with the record "it should be accorded significantly less weight." Craig v. Charter, 76 F.3d 585, 590 (4th Cir. 1996). Here, Dr. Hartman's own findings regarding O'Connell (including that he lacked suicidal ideation, that he had intact sensorium, that he was looking forward to his daughter's engagement party and that his goal was to get him into therapy and to limit or eliminate his drinking), are inconsistent with a GAF of 50. R. 611.

In adopting Dr. Gardner's opinion, the ALJ also considered the reports O'Connell made to doctors about what he was capable of doing, as well as the limited treatment he received. R. 23–24. The ALJ noted the length of time between O'Connell's alleged onset date and his first visit to a mental health provider, and the length of time between visits thereafter. R. 23–24. All of these factors went into the decision to "generally adopt" Dr. Gardner's opinion regarding O'Connell's functional limitations. R. 24. Importantly, no other mental health provider— including Dr. Hartman—offered any opinion as to O'Connell's functional limitations. Thus, the ALJ's decision to adopt Dr. Gardner's functional limitations assessment is supported by substantial evidence.

O'Connell relies on numerous studies and other third-party sources that discuss research linking sudden hearing loss with depression and anxiety, especially in older adults. See, e.g., Dkt. No. 12 at 29–31. He contends that the ALJ failed to consider such studies, both in evaluating O'Connell's credibility and in determining "the impact of plaintiff's anxiety, depression, and concentration deficits" upon his RFC. Dkt. No. 12, p. 31. None of these studies

15

relate specifically to O'Connell. The determination of disability is an individualized inquiry and must be based on medical records of the claimant—not upon generalizations or research about what happens to similarly-situated individuals—and this is perhaps particularly important when talking about an individual's mental reaction to physical problems. See, e.g., Richardson v. Astrue, 2013 WL 315705, at *3 (D.S.C. Jan. 28, 2013) (unpublished) (rejecting claimant's argument that various medical articles and other medical research suggested his condition was more severe than the ALJ found, because he "did not assert how any of the generalized medical research and findings would dictate any limitations more restrictive than those set forth in the RFC analysis").

In sum, while it is clear that O'Connell is impaired to some degree in his mental functioning, the ALJ's determination as to the extent of that impairment is supported by substantial evidence.

## **Credibility**

O'Connell next argues that the ALJ improperly found that his testimony regarding the severity of his symptoms was not credible. The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). O'Connell's subjective complaints of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether O'Connell has met his burden of proving that he suffers from an underlying impairment which is reasonably expected to produce his claimed symptoms. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). This assessment requires the ALJ to evaluate the intensity and persistence of O'Connell's claimed symptoms and the effect those disabling conditions have on O'Connell's ability to work. Id. at 594–95. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere

16

with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

The ALJ made detailed credibility findings as to O'Connell's subjective complaints of his symptoms related to his hearing loss, mental impairments, and other impairments. R. 23–24. The ALJ determined that O'Connell was not "fully credible," R. 24, and that his testimony was not credible to the extent his description of his symptoms was inconsistent with the RFC found by the ALJ. R. 23. O'Connell claims that those findings are not supported by substantial evidence. Dkt. No. 12 at 32. The ALJ properly considered the treatment sought and received, the limited nature and timing of such treatment, and evidence of inconsistent statements; which are all proper bases for discounting a claimant's credibility. See, e.g., Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (failure to seek treatment can be basis for discounting claimant's credibility).

O'Connell does not point to any evidence that the ALJ in the record that the ALJ failed to consider or assert that the ALJ utilized an improper legal standard when determining O'Connell's credibility. My inquiry is not whether O'Connell's testimony is corroborated by other evidence. Instead, my inquiry is whether ALJ's decision is supported by substantial evidence in the record before the Court. 42 U.S.C. § 405(g). If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination. Spencer v. Barnhart, 2007 WL 1202865, at *1 (W.D. Va. Apr. 20, 2007) (citing Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir.2001)). Here, the ALJ's decision identifies the evidence forming the basis of his credibility determination, and adequately explains his reasons for finding O'Connell's statements about his

symptoms not fully credible. I must therefore affirm the ALJ's credibility determination.

### **Applicability of Medical Vocational Guideline 202.06**

I conclude that substantial evidence supports the RFC as determined by the ALJ, including the finding that O'Connell can perform medium level work with additional restrictions. Medical Vocational Guideline 202.06,[5] which O'Connell argues would direct a finding of "disabled" for a person of his age, education, work experience and the capacity to perform the full range of light work, has no applicability here.

### **CONCLUSION**

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of

---

[5] To aid the Commissioner in making the determination of whether a significant number of jobs in the national economy that a claimant can perform given his or her RFC, the Commissioner promulgated the Medical-Vocational Rules, or "grid tables," located at 20 C.F.R. Part 404, Subpart P, Appendix 2. Washington v. Astrue, 698 F. Supp. 2d 562, 571 (D.S.C. 2010). These tables "indicate the proper disability determinations for various combinations of age, education, and previous work experience in conjunction with the individual's residual functional capacity . . . ." Hall v. Harris, 685 F.2d 260, 265 (4th Cir. 1981).

Case 6:13-cv-00035-NKM-RSB   Document 17   Filed 08/13/14   Page 18 of 19   Pageid#: 847

such objection.

>Enter: August 13, 2014

>*Robert S. Ballou*

>Robert S. Ballou
>United States Magistrate Judge